## BROWN et ux. v. SHANNON WEST TEXAS MEMORIAL HOSPITAL et al.

### No. 9802.

Court of Civil Appeals of Texas. Austin.
June 8, 1949.

Rehearing Denied July 6, 1949.

Sedberry & Williams and H. O. Williams, San Angelo, for appellants.

W. C. Gowan, Carrington, Gowan, Johnson & Walker, Dallas, for appellee Baylor University.

Kerr, Gayer & Sutton and Lloyd Kerr, San Angelo, for appellee Shannon West Texas Memorial Hospital.

GRAY, Justice.

Appellants, D. M. Brown and wife, Minnie Mae Brown, sued Shannon West Texas Memorial Hospital and Baylor University for damages sustained by Mrs. Brown due to an infection in her arm. It is alleged this infection resulted from the use of a

nonsterile needle used in taking a blood donation from Mrs. Brown at Shannon. (This operation is termed phlebotomy.)

The undisputed facts show there was an arrangement between Baylor and Shannon whereby blood plasma was furnished to Shannon by Baylor. Under this arrangement Shannon received blood donations at San Angelo and the blood was shipped to Baylor at Dallas, where it was processed into blood plasma. For the purpose of receiving blood donations, Baylor sent to Shannon what is here termed "a collecting unit," which contained a bottle, towels, tubing and two needles, one of which went into the bottle the blood was drawn into, and the other into the donor's arm. Also, there was in the collecting unit a small hypodermic needle used to deaden the donor's arm before the larger needle was inserted to draw the blood. This collecting unit and its contents were sterilized and packed at Baylor and then sent to Shannon where it was kept until used. Neither the unit nor its contents were resterilized at Shannon.

Mrs. Brown testified that on August 19, 1946, in response to a request from Shannon, she went to the hospital and told Mr. Head (Shannon's business manager) that she had come to give the blood requested. She then went to the room as directed by Mr. Head. Two nurses were there, these nurses swabbed her arm with a swab, used a hypodermic needle to deaden the arm, and then inserted a larger needle into her arm for the purpose of drawing the blood. Great difficulty was encountered by the nurses in inserting the needle into the vein. This took more than six minutes by Mrs. Brown's watch, and was very painful. After completing the phlebotomy the nurses taped gauze on Mrs. Brown's arm, gave her a bandaid and told her to put the bandaid on her arm when she took the gauze off. After she gave the blood, Mrs. Brown went down town, remained a very short time, and then returned home to the ranch, which was about an hour's drive from San Angelo. In returning home she traveled in a car and was accompanied by her husband. She testified:

"I suffered from the time they injected that needle into my arm up to this present day; I haven't been out of pain day or night and I suffered all the way home and by the time I got home there was a place that big around that was red and puffed up there and it felt hot and feverish and I was up all night long taking aspirin for the pain in my arm; I didn't sleep any that night."

Since the date of her blood donation, Mrs. Brown has received treatement from different doctors and has been a patient at St. John's Hospital in San Angelo, where she was under the care of Dr. Powers. On Monday (August 26) after the phlebotomy Mrs. Brown reported to Shannon and was there hospitalized for twelve days and was under the care of Dr. Kunath. No charge was made for any of the services received by Mrs. Brown during these twelve days.

It was not disputed in the trial court, and is not disputed here, that Mrs. Brown has sustained serious injury. At the trial Mrs. Brown's arm was exhibited to the jury and its then condition described by Dr. Kunath as follows:

"There is an area here approximately an inch and a half by three inches in diameter which is crusted over and it's safe to assume there's some type of chronic infection present there; it would be impossible to describe it, to say any more than it is covered by a heavy scab. There is an area of surrounding redness, perhaps another half inch on all sides, and there's an obvious contracture of the elbow and that is a shortening of the muscles so that I don't believe she can extend this arm."

At the trial sixteen special issues were submitted to the jury, none of which were answered. Upon appellee's motion, the court withdrew the case from the jury and rendered judgment that appellants take nothing.

Appellants say Shannon is liable for Mrs. Brown's injuries because it furnished a nonsterile needle for use in the phlebotomy, and Baylor is liable because the needle was contaminated at the time it was furnished by Baylor to Shannon for such use; that both are liable under the public policy rule of implied warranty of purity, and because of the joint arrangement existing between them.

In order for appellants to sustain their alleged cause of action, they must

show, by competent evidence, that the needle used was, at the time of its use, infected or contaminated, and that such needle was a proximate cause of the injuries. It is not enough that the evidence shows that Mrs. Brown's arm became infected and that she has sustained injuries and damages. "What is an infection and from whence did it come are matters determinable only by medical experts." Kaster v. Woodson, Tex.Civ.App., 123 S.W.2d 981, 983, Er.Ref. This is a scientific field wherein conclusions must be guided by the opinions of experts. Scott v. Liberty Mut. Ins. Co., Tex.Civ.App., 204 S.W.2d 16, Er. Ref. N. R. E.

At the trial a number of witnesses testified, most of whom were lay witnesses. Three doctors and four nurses testified. We have carefully examined the entire record, and, applying the above rules, we find no competent evidence as to the source of Mrs. Brown's infection. Dr. Kunath said: "I would have no way whatever to determine at what time the infection was introduced." Dr. Powers said, in the absence of making a culture of the things used, "you can't tell the origin or source of infection." Dr. Hill, director of laboratories and director of the blood bank at Baylor, testified that the blood that came from outside Baylor was segregated and put on a special shelf; that tests were run to determine whether or not there was any contamination in the blood and that this was done under his supervision. He further said that, assuming the needle used in extracting Mrs. Brown's blood had been contaminated, the contamination should have shown up in the culture of the blood; that the blood that came in from Shannon on August 21, 1946, did not show any contamination. (The evidence shows Mrs. Brown's blood was shipped from San Angelo August 20, and should have been received by Baylor August 21, 1946.) Dr. Hill expressed his opinion that the infection in Mrs. Brown's arm was more likely to have been received after the phlebotomy than in the course of such phlebotomy, in view of the fact that he had cultural evidence that there was not contamination on the needle used. No medical expert fixed the source of the infection.

Since the infection is not shown by any competent evidence to have been caused by the acts of appellees, or either of them, appellants have failed to discharge the burden of proving the needle used in the phlebotomy was infected and that the infected needle was a proximate cause of Mrs. Brown's injuries. Neither does the evidence show some other act of appellees caused such injuries. In any event the evidence goes no further than to show that the injuries sustained by Mrs. Brown could have resulted from the use of a nonsterile needle. In Bowles v. Bourdon, 147 Tex. ——, 219 S.W.2d 779, 785, the Supreme Court used language as follows:

" 'When the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury.'

"And if the plaintiff would rest upon inferences rather than upon direct evidence, he meets the same rule. 'The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts.' "

Appellants' point that the public policy rule of implied warranty of purity announced in Jacob E. Decker & Sons v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479, and Griggs Canning Co. v. Josey, 139 Tex. 623, 164 S.W.2d 835, 142 A.L.R. 1424, is applicable to this record, need not be discussed, because appellants have not shown, by competent evidence, that the injuries sustained by Mrs. Brown were caused by the needle furnished by appellee Baylor and used by appellee Shannon. For the same reasons a discussion of the alleged joint liability of appellees is pretermitted.

Upon the trial the court, upon objection, excluded portions of the hospital record made at the time Mrs. Brown was admitted to Shannon as a patient. This record was made under the direction of Dr. Kunath. At the time of her admission, Mrs. Brown was placed under the care of Dr. Kunath by Dr. Hixson, who at the time was acting for Shannon. Such record was a record of Shannon and was a record required to be kept. Art. 4477, rule 50a, V.A. T.C.S. As such it was admissible in evidence as a public record. Tex.Jur. 10-Year Sup., Vol. 5, p. 584; also Vol. 4, p. 673; Dallas Coffee & Tea Co. v. Williams, Tex. Civ.App., 45 S.W.2d 724. The portions of the record excluded by the trial court and which are pertinent here are:

"Admission Note—Pt. was admitted to the hospital for treatement of a severe infection and cellulitis of the rt. arm, following withdrawal of blood for a blood transfusion about a week ago. The procedure was carried out in this hospital. Pt. has been treating the infection at home with the advice of Dr. Swann, but making very little progress. Accordingly he advised hospitalization today.

"Present Illness—One week ago, on 19 Aug. this pt. came to the Shannon Hospital and gave a pt. of blood to pay back a loan to the blood bank. She states that considerable difficulty was encountered by the technician in finding a vein and that several attempts were made. Following the phlebotomy she had a pain and soreness in the region where the needle was inserted and that evening noted a black-and-blue area in the rt. antecubital space, which was very sore. The following day after an almost sleepless night the arm was swollen and there was redness all about the antecubital space, extending up the arm toward the axilla. She consulted Dr. Swann and he advised her to apply hot packs, using Epsom salts. This was carried out and has been carried out throughout the past week; however, the swelling in the arm has persisted and blister formation has occurred throughout the entire anterior aspect of the elbow and has been accompanied by almost constant pain. The arm persisted in its swelling and red streaks were noted, which extended up to the axilla. Tender lymph nodes were present in the arm pit. She has been running a low-grade temp.

"Under Dr. Swann's direction she has been taking sulfanilamide tabs, but in spite of all these measures there has been very little improvement in the arm to be noted."

"8/28/46. This patient was admitted two days ago as a very severe cellulitis of the rt. arm, originating in the antecubital space as a result of a phlebotomy performed for the giving of blood or plasma about one week ago."

Appellants lay stress on the use of the phrase, "following withdrawal of blood for a blood transfusion about a week ago." According to the testimony of Mrs. Brown, the soreness in her arm was after the phlebotomy, though she said she suffered pain during the operation. We think the word "following" as used means *after* and not *caused by* as argued by appellants. The above-quoted record would dispute any other meaning for the word.

As we understand them, appellants argue that the use of the phrase, " * * * as a result of a phlebotomy performed * * *," (used in the quotation "8-28-46") is an expression of an opinion by Dr. Kunath that Mrs. Brown's injuries originated in the operation. We do not think the record so says, but says the patient was admitted "as a very severe cellulitis of the rt. arm, originating in the antecubital space as a result of a phlebotomy performed * * *." This, we think, was no more than a statement of the purpose for which the patient was admitted.

Dr. Kunath testified that he had no way of determining at what time the infection was introduced into Mrs. Brown's arm. Our analysis of the hospital records, though admissible in evidence, is that they have no probative force, for which reason their exclusion was harmless error. For the same reason the exclusion of the records of St. John's Hospital, which were kept under the direction of Dr. Powers, was harmless error.

Appellants further complain of the action of the trial court in excluding the testimony of Mrs. Brown and Mrs. J. L. Cheshire, to the effect that Mr. Head (business manager for Shannon) told Mrs.

252

Brown that he knew she received the infection at Shannon. Mr. Head was not a medical expert and therefore was not qualified to express an opinion on the subject of infection.

We here hold that appellants failed to discharge the burden of proof resting on them to show, by competent evidence, that the needle used in drawing blood from Mrs. Brown's arm was infected, and for which reason judgment of the trial court must be affirmed.

Affirmed.